**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO.  04-697-1** |
| | : | |
| **MALCOLM LADSON** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                    **June 22, 2020**

      Weeks before COVID-19 mitigation changed our way of life in Pennsylvania this March, the United States transferred Malcolm Ladson to FCI-Allenwood to continue serving his sentence imposed in August 2005 for conspiring to rob a jewelry store after earlier convictions for robberies. The Bureau of Prisons calculates his release date as November 1, 2022.  FCI-Allenwood properly treats him for type 2 diabetes, gout, and high blood pressure.  Mr. Ladson, represented by the Federal Defender, now seeks compassionate release from custody. He argues his medical conditions coupled with an elevated threat of contracting COVID-19 while in custody presents the type of extraordinary and compelling reasons Congress requires for us to reduce his sentence.  The United States admits Mr. Ladson's medical conditions meet Congress' mandate of extraordinary and compelling reasons but opposes his release because he would present a danger to the community if released and would undermine goals of criminal sentencing.  It cites Mr. Ladson's career offender status in 2005 and limited disciplinary issues at an earlier institution.  Following careful review of his medical records, limited and relatively minor disciplinary history, and an evidentiary hearing where we evaluated the credibility of evidence adduced from Mr. Ladson, his wife, and an employer agreeing to hire Mr. Ladson immediately, we today reduce Mr. Ladson's sentence to time served with specific supervised release conditions for the next three years.

I.      **Facts**[1]

Malcolm Ladson is a Philadelphia native born in 1966.  His parents, James and Ruby Ladson, separated three years after his birth.  Mr. Ladson describes his childhood as "difficult."[2] Mr. Ladson recounts being abused by his mother and entering foster care.[3]

Mr. Ladson has a lengthy drug history.  He reported smoking crack cocaine, spending approximately $200 per day between 1991 until an arrest in 1993.[4]  Mr. Ladson occasionally used cocaine beginning in 1987.[5]  Mr. Ladson swore he has also abused codeine cough syrup.  Mr. Ladson also swore no longer suffers from addiction.

Before his October 1999 robbery leading to his present sentence, Mr. Ladson spent much of his adult life in prison after robbing retail stores. By way of example, courts earlier convicted him of (1) terroristic threats under Pennsylvania law based on a June 14, 1990 incident where Mr. Ladson threatened to injure an employee when he and three other individuals fled while stealing from a sporting goods store in King of Prussia, Pennsylvania; and, (2) being one of twelve men and two jewelers who collectively robbed over $2 million in jewelry from twenty-seven jewelry stores in multiple states over eight months in 1993.[6]

While on supervised release for his 1993 robberies, Malcolm Ladson and four other men drove from Philadelphia to Woodlawn, Maryland to rob the Gold Valley Jewelry Store on October 28, 1999.  Along the way, the men stole a Chevrolet Blazer to use as a getaway vehicle.   The men entered Gold Valley Jewelry Store sporting hammers and wearing ski masks and gloves.  The men smashed the store's display cases and fled with approximately $485,605 in stolen jewelry.  The police apprehended and arrested two of the men while attempting to flee.  Mr. Ladson and the two other men escaped and returned to Pennsylvania.  Investigators later matched DNA from Mr. Ladson to a ski mask recovered at the crime scene.

On October 28, 2004, our grand jury indicted Mr. Ladson for conspiring to commit robbery interfering with interstate commerce (Hobbs Act robbery) under 18 U.S.C. § 1951(a).  On March 9, 2005, a jury found Malcolm Ladson guilty.[7]  During sentencing, the United States characterized Mr. Ladson as a "career offender" because of his earlier convictions.[8]

Mr. Ladson did not dispute "career offender" status during sentencing before Judge Yohn. This classification raised his total offense level from Level 29 to Level 32 and increased his Guidelines range from 151–188 months to 210–262 months.[9]  Judge Yohn sentenced Mr. Ladson to 240 months of incarceration, the statutory maximum for Mr. Ladson's offense.[10]  Mr. Ladson's current release date is November 11, 2022.

### A.     Mr. Ladson's conduct while incarcerated

While incarcerated at FCI Otisville, Mr. Ladson served as a facilitator for the victim impact program and received a certificate in 2011.[11] Mr. Ladson became "so effective in this role that he was eventually tasked with running the program entirely."[12]  Mr. Ladson swears a counselor at FCI Otisville helped him take accountability for things which happened in his past.  In the 2011 to 2014 timeframe, Mr. Ladson swears he completed modules in robbery and child abuse.  Mr. Ladson is also currently enrolled in the Residential Drug Abuse Program at FCI-Allenwood but has not progressed beyond the beginning stages of the program because COVID-19 suspended regular meetings.

Mr. Ladson has also mentored many younger inmates.[13]  Mr. Ladson swears he wants to continue mentorship programs once he reenters the community.  Mr. Ladson has been involved with the Mothers in Charge organization and the Carson Valley School.

Balanced against his laudable efforts, Mr. Ladson has received disciplinary citations during his sentence.  In 2019, Mr. Ladson received a citation for a disruptive group demonstration.[14]  We

asked Mr. Ladson to explain.   Mr. Ladson swore he intervened to diffuse an altercation between a young man who he knew from the neighborhood and the Imam during a Muslim Jummah prayer after the young man disagreed with the appropriate interpretation of a religious text.[15]  Mr. Ladson "walked the young man off the yard in order to deescalate the conflict and avoid the risk of an altercation."[16]  Mr. Ladson knew the young man's mother, which motivated him to intervene.  Mr. Ladson successfully diffused the situation but still received the citation and "was punished with fifteen days in segregation."[17]  He did not contest the finding.

**B.      Mr. Ladson's future.**

 Mr. Ladson has two children.[18]  A third child, Mr. Ladson's son, passed away in 2008. Mr. Ladson swears, at the time of his arrest in 2004, he cared for his young daughter.  He swears this daughter is now nineteen and is "living on the street."

Mr. Ladson married LaVone Ladson in 1994 while incarcerated.[19]  If released, both Mr. and Mrs. Ladson swear he would reside with her at her three-bedroom apartment in West Philadelphia.  Currently, only Mrs. Ladson lives in the residence, but she is sometimes visited by her son and takes care of her elderly mother.  Mrs. Ladson swore she could assist Mr. Ladson obtain his medications.  Mrs. Ladson swore to her regular employment with Paoli Hospital travelling there by trolley and train.

Mr. Ladson has a limited work history.  He enjoyed sporadic employment since 1993 because he has been incarcerated for lengthy periods of time.[20]  He received his GED while in custody for an earlier conviction.[21]

But Mr. Ladson is prepared to support himself through a job at T&S Hauling Services in Doylestown, Pennsylvania. Dennis Freeman owns and operates T&S Hauling.  Mr. Freeman testified at our hearing.  He swore he opened the business a few years ago, and it now consists of

three employees including himself.  He swears T&S Hauling transports new and used passenger vehicles from ports in New Jersey, Pennsylvania, Delaware, and Maryland to car dealerships in the greater Delaware Valley region.  Mr. Freeman swore he would hire Mr. Ladson as he knew him and their wives are acquainted.   Mr. Freeman swore he will initially hire Mr. Ladson in a maintenance role for between ten and twelve dollars per hour until Mr. Ladson can restore his driver's license.   During this time, Mr. Ladson will commute to Doylestown by public transportation.  Once Mr. Ladson restores his driver's license, Mr. Freeman swore Mr. Ladson will drive a truck picking up and delivering vehicles and will make approximately fifteen dollars per hour in this role.  Mr. Freeman swore he would let Mr. Ladson borrow a small truck from the company so that he can commute home to Philadelphia each day.  Mr. Freeman swore each vehicle is equipped with a GPS tracking device.

### C.      Mr. Ladson's health.

Mr. Ladson's medical records confirm his type 2 diabetes, gout, and high blood pressure.[22] Mr. Ladson has taken vitamin A and D ointment for ongoing diabetic footcare after sustaining foot abscesses in 2013 and 2016, and other tissue infections in 2008, 2015, and 2016.[23]  His hemoglobin A1C, a blood test used to monitor management of diabetes, is at 6.3 (above the normal range), and his diabetes is currently managed with metformin.[24]  Mr. Ladson has regular gout flares, including three in the past seven months.[25]   His hypertension is confirmed by elevated blood pressure readings despite Mr. Ladson taking hydrochlorothiazide and lisinopril to manage this condition.[26]

### D.      COVID-19 affecting persons held in prisons.

The new, or novel, "coronavirus disease 2019," known as COVID-19, is a respiratory disease spreading through respiratory droplets produced when an infectious person, even those who are asymptomatic, talks, coughs, or sneezes.[27] "Spread is more likely when people are in close

contact with one another (within about 6 feet)."[28]  COVID-19 spreads "easily and sustainably in the community ("community spread") in many affected geographic areas. Community spread means people have been infected with the virus in an area, including some who are not sure how or where they became infected."[29]  The Centers for Disease Control and Prevention traces the spread of COVID-19 to the first cases reported in Wuhan, China in December 2019.[30]

COVID-19, which has now spread throughout the World, poses a serious global public health risk.  As of June 8, 2020, the Centers for Disease Control and Prevention reported a total of 2,248,029 cases of COVID-19 in the United States with 119,615 total deaths caused by the virus.[31] Persons with serious underlying medical conditions may be at higher risk for severe illness from COVID-19, including those with serious heart conditions, moderate to severe asthma, diabetes, chronic lung disease, or a weakened immune system.[32]

Correctional and detention facilities "present unique challenges for control of COVID-19 transmission among incarcerated/detained persons [and] staff[.]"[33]  Even people without symptoms can infect others.[34] While we hope most socially distance from each other to avoid community spread, incarcerated persons cannot follow the Center for Disease Control's guidelines to mitigate the spread of the virus and face a heightened risk of contagion.[35]  According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[36]

As of June 16, 2020 the five largest known clusters of COVID-19 in this country grew inside correctional institutions.[37]  In the last month, the number of known infected incarcerated people doubled and prison deaths increased by seventy-three percent.[38] Testing remains of paramount importance, as one in seven virus tests conducted on incarcerated people have come

back positive, and the vast majority of positive people in prison are asymptomatic--yet still shed the virus.[39]

## II.    Analysis

Mr. Ladson, through the Federal Defender, moves for compassionate release.[40]  Congress allows us to reduce a sentence through compassionate release if we determine (1) the incarcerated movant meets administrative exhaustion requirements, (2) "extraordinary and compelling reasons" warrant a reduction, (3) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission"; and, (4) the applicable sentencing factors under 18 U.S.C. §3553(a) warrant a reduction.[41]   The United States does not dispute Mr. Ladson meets the first and second requirements: Mr. Ladson petitioned the Bureau of Prisons before filing this motion, and he presents an "extraordinary and compelling" reason for his release because his diabetes is a risk factor for death or serious injury if he contracts COVID-19.  But the United States argues we cannot release Mr. Ladson because is a danger to his community so his release would be inconsistent with applicable policy statements.  The United States also argues the section 3553(a) factors do not warrant a reduction because early release would not reflect the seriousness of the offense, promote respect for the law, or provide just punishment for the offense.  We disagree and today reduce Mr. Ladson's sentence to time served and modify the terms of supervised release to ensure his progress through meaningful employment, stable home, and community outreach.

### A.    The United States does not contest the danger COVID-19 presents to Mr. Ladson as a type 2 diabetic constitutes "extraordinary and compelling reasons" for his release.

The United States does not contest Mr. Ladson's type 2 diabetes combined with the risk of contracting COVID-19 for him satisfies the "extraordinary and compelling reasons" Congress requires to reduce a final sentence.  Even if uncontested, we still review Mr. Ladson's health as a

key component to our analysis in considering his motion for release given he will remain at high risk for contracting COVID-19 upon release for the foreseeable future and place those around him at risk.

As amended by the First Step Act,[42] Congress provides a mechanism for us to modify terms of imprisonment if "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . ."[43]   Section 1B1.13 of the United States Sentencing Guidelines is the only applicable policy statement.[44]   The policy statement provides to constitute "extraordinary and compelling reasons," we must find:

> (A) Medical Condition of the Defendant.—
>
> (i)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii)    The defendant is—
>
> > (I)     suffering from a serious physical or medical condition,
> >
> > (II)    suffering from a serious functional or cognitive impairment, or
> >
> > (III)   experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the defendant.—
> . . .
> (C) Family Circumstances.—
> . . .
> (D) Other Reasons.—As determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).[45]

The United States concedes Mr. Ladson's condition falls within note 1(A). The United States admits a person like Mr. Ladson who "presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents 'a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility,' as stated in note 1(A), as, due to his comorbidities, such a defendant may be less able to protect himself against an unfavorable outcome from the disease."[46] The United States, however, expressly rejects Mr. Ladson's risk of adverse outcomes from COVID-19 would fall under the catchall in note 1(D).[47]

The CDC recognizes "[d]iabetes, including type 1, type 2, or gestational, may put people at higher risk of severe illness from COVID-19."[48] A recent meta-analysis of nine studies from China showed a significant correlation between diabetes and the severity of COVID-19 symptoms,[49] and a recent study from the United States found a fourfold increase in mortality rates from COVID-19 among diabetic patients.[50] How exactly diabetes impacts COVID-19 severity is unclear, but there are a number of potential factors.[51] Poor blood sugar control impairs many innate and adaptive immune responses to viral infections, and similarly impairs immune response to secondary bacterial infections of the lungs common among COVID-19 patients.[52] Defects in the activity of immune system cells, "namely inappropriate T-cell action, impaired natural killer cell activity and defects in complement action," reduce the body's ability to clear viruses.[53] In addition, pre-existing comorbidities associated with diabetes, like hypertension, can lead to worse outcomes from COVID-19.[54] Low blood sugar can occur during the treatment of COVID-19, which is particularly dangerous for those with diabetes and may worsen clinical outcomes.[55]

Given the medical data, judges recognize the unique risk presented by the combination of COVID-19 with diabetes and hypertension.[56] For instance, in *United States v. Rivernider*, Judge

Robert N. Chatigny found extraordinary and compelling reasons where the movant seeking compassionate release was "[fifty-four] years of age with diabetes, heart disease and hypertension, all significant risk factors for severe illness were he to contract COVID-19."[57]   And in, *United States v. Pabon*, Judge Anita B. Brody granted compassionate release to a fifty-four year old man suffering from diabetes and hypertension, stating "the confluence of COVID-19 and Mr. Pabon's health conditions [made] this circumstance extraordinary and compelling."[58]   Like in *Rivernider* and *Pabon*,  Mr. Ladson is fifty-four years old and suffers from both ailments.  His heightened risk for adverse outcomes or death is more than "extraordinary and compelling;" it is life threatening and urgent.

### B.  Mr. Ladson is not a danger to others or the community.

Mr. Ladson argues he has shown by his conduct he is no longer a threat to public safety and granting him compassionate release would not endanger the community.  The United States responds Mr. Ladson's criminal and disciplinary history shows he would endanger the community if released.  There is no evidence of violence in Mr. Ladson's earlier crimes or conduct while in prison.

The Sentencing Commission's policy statement provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[59]  The Commission defines factors we must consider in deciding whether to release a person in prison.  These factors weigh the possible danger to the community, including "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history,"

and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."[60]

Sentencing judges reviewing the nature and circumstances of the offense charged focus on the violence of the crime and how long ago the crime took place.[61]  Even in light of COVID-19 risks, judges are reluctant to grant compassionate release if the movant committed a violent crime within a relatively short time period of moving for compassionate release.[62]  For instance, in *United States v. Martinez*, Judge Alison J. Nathan denied Mr. Martinez's motion for compassionate release because he committed several violent crimes through his membership in "a violent gang" less than ten years before moving for compassionate release.[63]  Mr. Martinez demonstrated an extensive history of violent criminal activity, including a pending murder charge relating to his role in the criminal conspiracy to sell narcotics from which he sought a sentence reduction.[64]

But judges are more willing to grant compassionate release if the movant's violent offense occurred longer ago, even in light of repeated criminal activity.[65]  In *United States v. Echevarria*, Judge Michael P. Shea granted Mr. Echevarria's motion for compassionate release despite his violent offense and his deep criminal background in drug sales.[66]  Judge Shea noted Mr. Echevarria committed the violent offense "over 18 years ago" and expanded the inquiry of Mr. Echevarria's danger to the community to include his "rehabilitative efforts."[67]

A movant's status as a career offender at sentencing has not precluded the movant from successfully moving for compassionate release.  In *United States v. Williams*, Mr. Williams, a career offender, requested his compassionate release from Judge M. Casey Rodgers because of the risks COVID-19 presented based on his underlying health diagnoses, including severe coronary and peripheral vascular disease, congestive heart failure, left ventricular dysfunction, end-stage renal disease, hyperlipidemia, and prediabetes.[68]  Despite career offender status, Judge Rodgers

granted Mr. Williams' motion, reasoning "the risk of [Mr. Williams] engaging in further criminal conduct is minimal and can be managed through home confinement and the terms of his supervised release."[69]

We consider many aspects of the movant's character beyond criminal background to assess history and characteristics.  Disciplinary record in prison bears on this assessment and is illustrative of character.[70]  For example, in *United States v. Copeland*, Judge Frederic Block rejected the notion Mr. Copeland remained a danger to the community by looking to Mr. Copeland's "exemplary" behavior while in prison.[71]  Judge Block highlighted Mr. Copeland's lack of incidents during his nineteen-year period of incarceration in granting his motion for compassionate release, despite his role in a bank robbery.[72]

Our colleagues have not required a movant to have a clean behavioral record while in prison.[73]   We instead consider the inmate's participation in prison programming in tandem with the inmate's disciplinary record.[74]  In *United States v. Curtis*, Judge Beryl Howell considered Mr. Curtis's minimal and exclusively non-violent disciplinary record and his completion of the prison's non-residential drug treatment program as evidence of his rehabilitation in prison, concluding Mr. Curtis no longer posed a danger to others.[75]

We also closely inspect a movant's connection to his or her family.  Some movants who have successfully petitioned for compassionate release have done so in part by demonstrating the existence of a supportive family who will help their reentry into the community.[76]  For instance, in *United States v. Loyd*, the movant's fatherhood to four children persuaded the court to grant the motion as his parenthood would reduce the likelihood he would regress into criminal behavior.[77] And in *United States v. White*, Judge Matthew Leitman accepted Mr. White's assertion his "numerous family members" would help him to continue his rehabilitation outside of prison.[78]

*Loyd* and *White* are representative of judges focusing on positive familial relationships when granting an inmate's compassionate release.

Our colleague Judge Anita B. Brody's decision to grant compassionate release in *United States v. Rodriguez* is instructive for how to weigh each of these factors in concert.[79]   Mr. Rodriguez, a diabetic, moved for compassionate release with three years remaining on his original twenty-year sentence for "drug distribution and unlawful firearm possession[.]"[80]  Mr. Rodriguez had a disciplinary record with nonviolent infractions.[81]  Mr. Rodriguez requested to return to his home if granted compassionate release.[82]  Judge Brody granted compassionate release; she focused on the amount of time between Mr. Rodriguez's criminal offenses and his motion for release, his completion of prison rehabilitation programming with his nonviolent disciplinary infractions, and the assurance he had a stable home to which he could return to hold he no longer posed a "danger to the community."[83]

Mr. Ladson presents several facts which in totality lead us to conclude he would not pose a danger if granted compassionate release.  We first look at the nature and circumstances of the offense charged.  Mr. Ladson is serving a twenty-year sentence for a "smash and grab" at a Maryland jewelry store.  Mr. Ladson used a ski mask and sported a hammer to smash display cases.  This could be fairly characterized as involving violence, even if Mr. Ladson did not physically harm a store employee or customer or bring a firearm. We must also confront Mr. Ladson's earlier convictions, which we must interpret as evincing at least an earlier behavioral pattern.  Yet, unlike *Martinez*, Mr. Ladson is not under investigation for a related crime; and we see no suggestion Mr. Ladson is involved with violent gang or would resort to criminal ways if released.  Like *Echevarria* and *Rodriguez*, Mr. Ladson's crime took place over twenty years ago. He has served over fifteen years. Like the movant in *Rodriguez*, he has less than three years

remaining on his sentence.[84] And, as in *Williams*, the risk of Mr. Ladson engaging in further criminal conduct can be managed through the terms of his supervised release.

Because Mr. Ladson's charged offense took place many years ago, we must concentrate our efforts, as Judge Brody did in *Rodriguez*, to Mr. Ladson's personal history and characteristics. This review weighs in favor of Mr. Ladson's release. As in *Curtis*, Mr. Ladson rehabilitated himself while in prison. He underwent counseling at FCI Otisville with a counselor who helped him take accountability for the things which happened in his past. He completed a certificate in victim impact and eventually assumed a leadership position in this program. He has mentored younger peers and seeks to continue his involvement with Mothers in Charge and Carson Valley School once released. Mr. Ladson enrolled in the Residential Drug Abuse Program but, for reasons out of his control, has not progressed beyond the beginning stages.

While Mr. Ladson is not the model inmate as in *Copeland*, his disciplinary track record does not indicate he would be dangerous member of his community. His most recent infraction— for disruptive group behavior—was his first infraction in five years. We heard extensive testimony about this incident. Mr. Ladson credibly testified to his role as attempting to diffuse contentions between a young man from his neighborhood and the Imam. As noted in *Readus*, a clean inmate disciplinary history is not a prerequisite to compassionate release. We look to Mr. Ladson's exclusively nonviolent disciplinary infractions, his attainment of certificates, and his willingness to attend counseling and to counsel younger members of his community to demonstrate his improved character like the movants in *Curtis* and *Rodriguez*.

As in *Loyd* and *White*, Mr. Ladson demonstrates strong family ties. Mrs. Ladson swore her husband would return to live with her in West Philadelphia. Mr. Freeman, the owner of T&S Hauling, swore his company would hire Mr. Ladson if released and record payments on W-2 and

1099 forms for income tax purposes.  Mr. Ladson hopefully understands the importance of these relationships in beginning a new and productive life.  We certainly do.  Our conditions of supervised release ensure his fidelity to these relationships.  Mr. Ladson credibly testified to his willingness to work for an honest living.  He also hopes to reconnect with his daughters. Weighing all evidence available to us, we conclude Mr. Ladson would not endanger his community upon his release.

**C.      Reducing Mr. Ladson's sentence is consistent with the section 3553(a) factors.**

We must then "consider[] the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."[85]  "Because section 3553(a) establishes factors to consider in initially imposing a sentence, not every factor applies here."[86] The applicable factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
. . . [and]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.][87]

We first look to the "nature and circumstances of the offense and the history and characteristics of the defendant."  As described above, Mr. Ladson is serving time for a Hobbs Act robbery.  He has an extensive criminal history.  But Mr. Ladson has shown rehabilitation and good conduct while in custody.  He shows he is committed to supporting himself by working.  This factor weighs in favor of a sentence reduction.

We then consider "the need for the sentence imposed." Congress mandates: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)."[88]  The United States argues releasing Mr. Ladson would undermine the seriousness of the offense, disrespect the law, and would not be just punishment for the offense. We disagree. Mr. Ladson received the mandatory maximum sentence for his crime (240 months). Mr. Ladson has already served a sentence on the low-end of the suggested guidelines for his crime (212 months). Serving a sentence within the guideline range—considering the significant dangers Mr. Ladson faces as an incarcerated person suffering from diabetes during the COVID-19 pandemic—does not undermine the seriousness of his crime or mean others will not be deterred from committing similar crimes.  We see no evidence Mr. Ladson will endanger his community or needs to remain incarcerated for necessary educational or vocational training, medical care, or other correctional treatment.  Mr. Ladson has served a sentence, based on present realities, sufficient to meet the purposes of paragraph two.

We then consider potential sentence disparities between Mr. Ladson and defendants with similar records who have been found guilty of similar conduct.  We again look to the sentencing guideline range of 210 to 262 months for Mr. Ladson's conviction.  Releasing Mr. Ladson would not create an unwarranted sentence disparity.  Mr. Ladson served a sentence in the guideline range.

## III.    Conclusion

In designing a system of compassionate release in the First Step Act, Congress decided incarcerated persons must be able to petition the federal courts, and not just the Bureau of Prisons, for compassionate release.  Congress requires the movant present us with "extraordinary and compelling" reasons for a sentence reduction and requires us to determine whether the movant

would be a danger to his community if released, and to weigh if a reduction is warranted under the factors we apply regularly in sentencing.

In the midst of the continuing COVID-19 pandemic, Mr. Ladson, a fifty-four year old hypertensive diabetic, moves for his compassionate release from custody after serving 212 months of a 240-month sentence for a Hobbs Act robbery.  The United States concedes Mr. Ladson presents an extraordinary and compelling reason for his release, requiring we only consider Mr. Ladson's danger to his community and the section 3553(a) factors before ruling on his release.  On the present record, Mr. Ladson would not endanger his community if released and the section 3553(a) factors weigh in favor of a sentence reduction.

In the accompanying Order, we reduce Mr. Ladson's sentence to time served but modify his supervised release conditions to ensure his continued progress through a stable home, employment, and community outreach in addition to drug and mental health treatment and our standard conditions of supervised release.

---

[1] We review and cite to the record in the ECF document system and Malcolm Ladson's Presentence Report [hereinafter "PSR"].  We also held a telephonic hearing where Malcolm Ladson, Lavone Ladson, and Dennis Freeman provided sworn testimony.  The United States did not object to the sworn telephonic testimony.   We do not yet have access to the transcript of this hearing but, due to the urgency presented in these unique circumstances, we rely on the adduced sworn testimony in our recitation of the facts.

[2] PSR ⁋ 56.

[3] *Id.* ⁋ 54–55.

[4] *Id.* ⁋ 63.

[5] *Id.* ⁋ 63.

[6] *Id.* at ⁋ 47.

[7] ECF Doc. No. 195, at p. 1.

[8] *Id.* at pp. 1–2; *see also* United States Sentencing Guidelines §4B1.1(a) (providing elements of "career offender" status).

[9] ECF Doc. No. 195, at p. 2.

[10] *Id.*

[11] ECF Doc. No. 260, at p. 2.

[12] *Id.*

[13] *Id.*

[14] ECF Doc. No. 252, at Ex. A.

[15] ECF Doc. No. 260, at p. 2.

[16] *Id.*

[17] *Id.* Mr. Ladson also received a 2014 citation for threatening a correctional officer, and 2010 and 2008 citations for disruptive conduct. ECF Doc. No. 252, at Ex. A. Mr. Ladson also received other, minor disciplinary citations. *Id.*  But the United States elected not to cross-examine Mr. Ladson about these events.

[18] PSR ⁋ 57–59.

[19] *Id.* ⁋ 54–58.

[20] *Id.* ⁋ 67.

[21] *Id.* ⁋ 65.

[22] ECF Doc. No. 253. The United States filed Mr. Ladson's medical records under seal.

[23] *Id.* at p. 73.

[24] *Id.* at pp. 10, 94. The normal range for a hemoglobin A1C is below 5.7%. *Id.* at 94.

[25] *Id.* at pp. 2, 13, 17.

[26] *Id.* at pp. 10, 29, 32.

[27]  Centers   for   Disease   Control   and   Prevention,   *How   COVID-19   Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-

spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html (last visited June 16, 2020).

[28] Centers for Disease Control and Prevention, *Coronavirus 2019 Basics*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ffaq.html#Coronavirus-Disease-2019-Basics (last visited June 17, 2020).

[29] *Id.*

[30] Centers for Disease Control and Prevention, *First Travel-related Case of 2019 Novel Coronavirus Detected in United States*, https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html (last visited June 9, 2020).

[31] Centers for Disease Control and Prevention, *Cases of Coronavirus Disease (COVID-19) in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited June 22, 2020).

[32] Centers for Disease Control and Prevention, *People who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 17, 2020).

[33] Centers for Disease Control and Prevention, *Guidance for Correctional Detention*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited June 9, 2020).

[34] Monica Ghandi, et al, *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19*, The New England Journal of Medicine, April 24, 2020, https://www.nejm.org/doi/full/10.1056/NEJMe2009758 ("[L]ive coronavirus clearly sheds at high concentrations from the nasal cavity even before symptom development…asymptomatic persons are playing a major role in the transmission of SARS-CoV-2.").

[35] *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007) (noting "[t]he probability of transmission of potentially pathogenic organisms [in prisons] is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise").

[36] "Achieving A Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.

[37] Timothy Williams, *et al.*, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, June 16, 2020, available at https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html.

[38] *Id.*

---

[39] *Id.*

[40] Mr. Ladson first moved *pro se* for compassionate release on April 22, 2020.   Congress requires an inmate request compassionate release from the Bureau of Prisons before filing a motion to the sentencing court and Mr. Ladson failed to do so. ECF Doc. No. 243. The United States contacted FCI Allenwood who advised it had no record of Mr. Ladson's request.  We denied Mr. Ladson's first motion without prejudice to be renewed after requesting his compassionate release from the Bureau of Prisons. ECF Doc. Nos. 244, 245. On May 4, 2020, Mr. Ladson petitioned the Bureau of Prisons for his compassionate release.  On May 12, 2020, Warden Howard denied this request. Warden Howard told Mr. Ladson he failed to meet the Bureau of Prisons standards for release under its Program Statement No. 5050.50: "Although you have medical concerns, you are not disabled or unable to perform activities of daily living." ECF Doc. No. 251-1. The Bureau of Prisons did not mention he would pose a risk to the community upon release. *Id.*   On May 12, 2020, we granted the Federal Defenders Office's motion for appointment.  The Federal Defender moved for compassionate release on May 21, 2020.  Following a need to reschedule, we heard evidence on June 16, 2020.

[41] 18 U.S.C. § 3582.

[42] First Step Act of 2018, Pub. Law No. 115-391, Dec. 21, 2018, 132 Stat 5194.

[43] 18 U.S.C. § 3582.

[44] U.S.S.G. § 1B1.13.

[45] *Id.*

[46] ECF Doc. No. 252, at p. 14 n.4.

[47] *Id.* at p. 14.

[48] Centers for Disease Control and Prevention, *People who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 17, 2020).

[49] Yingyu Chen et al. *Effects of hypertension, diabetes and coronary heart disease on COVID-19 diseases severity: a systematic review and meta-analysis*, MEDRXIV PREPRINT (March 30, 2020), https://www.medrxiv.org/content/10.1101/2020.03.25.20043133v1.

[50] Bruce Bode et al., *Glycemic characteristics and clinical outcomes of COVID-19 patients hospitalized in the United States*, J. DIABETES SCI. TECH., (2020), https://doi.org/10.1177/1932296820924469.

[51] Ritesh Gupta, Akhtar Hussain & Anoop Misra, *Diabetes and COVID-19: evidence, current status and unanswered research questions*, EUR. J. CLINICAL NUTRITION 74, 864–870 (May 13, 2020), https://doi.org/10.1038/s41430-020-0652-1.

[52] Julia A. Critchley et al., *Glycemic control and risk of infections among people with type 1 or type 2 diabetes in a large primary care cohort study*. DIABETES CARE 2018 (Aug. 13, 2018), https://doi.org/10.2337/dc17-2131; Steve Ferlita et al., *Type 2 diabetes mellitus and altered immune system leading to susceptibility to pathogens, especially mycobacterium tuberculosis*, J. CLINICAL MED (Dec. 16, 2019), https://doi.org/10.3390/jcm8122219.

[53] Gupta, *supra* at note 51, (citing Tawanda Maurice Nyambuya et al., *T-cell activation and cardiovascular risk in adults with type 2 diabetes mellitus: A systematic review and meta-analysis*. CLIN IMMUNOLOGY (Nov. 22, 2019), https://doi.org/10.1016/j.clim.2019.108313).

[54] *Id.*

[55] *Id.*

[56] *See, e.g.*, *United States v. Conner*, No. 07-4095, 2020 WL 3053368 (N.D. Iowa June 8, 2020) (granting compassionate release to a prisoner suffering from diabetes and hypertension during the COVID-19 pandemic); *Howard v. United States*, No. 16-20222, 2020 WL 2615509 (E.D. Mich. May 22, 2020) (same); *Wise v. United States*, No. 18-0072, 2020 WL 2614816 (D. Md. May 20, 2020) (same); *United States v. Rountree*, No. 12-0308, 2020 WL 2610923 (N.D.N.Y. May 18, 2020) (same); *United States v. Rivernider*, No. 10-222, 2020 WL 2393959 at *1 (D. Conn. May 12, 2020) (same); *United States v. Pabon*, No. 17-165, 2020 WL 2112265 (E.D. Pa. May 4, 2020) (same).

[57] *United States v. Rivernider*, No. 3:10-222, 2020 WL 2393959 at *1 (D. Conn. May 12, 2020).

[58] *Pabon*, 2020 WL 2112265, at *4.

[59] U.S.S.G. § 1B1.13(2).

[60] 18 U.S.C. § 3142(g).

[61] *United States v. Cotinola*, No. 13-03890, 2020 WL 2526717, at *4 (D.N.M. May 18, 2020).

[62] *United States v. Martinez*, No. 12-862-10, 2020 WL 2079542, at *2 (S.D.N.Y. Apr. 28, 2020).

[63] *Id.* at *2–3.

[64] *Id.* at *1–2.

[65] *United States v. Echevarria*, No. 17-0044, 2020 WL 2113604, at *3 (D. Conn. May 4, 2020); *Cotinola*, 2020 WL 2526717, at *4.

[66] *Echevarria*, 2020 WL 2113604, at *3.

[67] *Id.*

[68] *United States v. Williams*, No. 04-0095, 2020 WL 1751545 (N.D. Fla. April 1, 2020).

[69] *Id.* at *3.

[70] *United States v. Copeland*, No. 02-01120, 2020 WL 2537250, at *3 (E.D.N.Y. May 19, 2020).

[71] *Id.*

[72] *Id.* at *1, *5.

[73] *United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *4 (E.D. Mich. May 21, 2020); *see also United States v. Stephenson*, No. 05-00511, 2020 WL 2566760, at *7 (S.D. Iowa May 21, 2020) (describing a clean behavioral record as "no minor feat in any prison").

[74] *United States v. Loyd*, No. 15-20394-1, 2020 WL 2572275, at *4–5 (E.D. Mich. May 21, 2020).

[75] *United States v. Curtis*, No. 03-533, 2020 WL 1935543, at *5 n.10 (D.D.C. Apr. 22, 2020).

[76] *Loyd*, 2020 WL 2572275, at *4; *United States v. Schafer*, No. 18-06152, 2020 WL 2519726, at *7 (W.D.N.Y. May 18, 2020).

[77] *Loyd*, 2020 WL 2572275, at *4.

[78] *United States v. White*, No. 13-20653-01, 2020 WL 2557077, at *2 (E.D. Mich. May 20, 2020).

[79] *United States v. Rodriguez*, No. 03-00271, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020).

[80] *Id.* at *1.

[81] *Id.* at *10.

[82] *Id.* at *11.

[83] *Id.* at *10–11.

[84] ECF Doc. No. 195, at p. 1.

[85] 18 U.S.C. § 3582(c)(1)(A).

[86] *Rodriguez*, 2020 WL 1627331, at *6.

[87] 18 U.S.C. § 3553(a).

[88] *Id.*